IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ROBERT CROSS and JONATHAN
ZAKIN,

                Plaintiffs,

        v.

LEONARD A. BATTERSON,

           Defendant.

Case No. 17 C 198

Judge Harry D. Leinenweber

MEMORANDUM OPINION AND ORDER

The three former partners of the limited liability company Batterson Cross Zakin, LLC, have filed Cross Motions for Summary Judgment regarding company distributions, or lack thereof, after a 2015 divestiture. Plaintiffs Robert Cross and Jonathan Zakin seek partial summary judgment (Dkt. No. 85), and Defendant Leonard A. Batterson seeks complete summary judgment. (Dkt. No. 87.) For the reasons stated herein, the Court denies both Motions.

I. BACKGROUND

Over fifty years ago, Plaintiff Robert Cross ("Cross") and Defendant Leonard Batterson ("Batterson") met as undergraduate students at Washington University in St. Louis and became life-long friends. (Pl.'s Resp. to Def.'s Stmt. of Facts ("PSOF") ¶ 7, Dkt. No. 103.) Both Cross and Batterson went on to have successful careers in the financial sector, including working with each other

on deals and investments. (*Id.* ¶ 8.) Similarly, Plaintiff Jonathan Zakin ("Zakin") and Batterson have a longstanding professional relationship and have worked on "many deals" together. (*Id.* ¶ 4.) In 2005, Batterson approached both Cross and Zakin to form a small investment firm to be managed by the three parties. (*Id.* ¶ 10.) On September 23, 2005, the company Batterson Cross Zakin, LLC ("BCZ") was formed. (Def.'s Resp. to Pl.'s Stmt. of Facts ("DSOF") ¶ 1, Dkt. No. 99.) As a venture capital company, BCZ connects investors to investments. (Batterson Dep. 21:8-21; Def.'s Redacted Stmt. of Facts, Ex. 5, Dkt. No. 88-5.) When the investors make a profit on those investments, BCZ receives a percentage of that profit, referred to by the parties as the carried interest or carried interest fee. (*Id.* 21:22-24.)

BCZ was formed through amending the operating agreement of an existing entity, Batterson Venture Partners III, L.L.C. (DSOF ¶ 1.) The Amended and Restated Operating Agreement (the "2005 Agreement") stated that "the sole Member [Batterson] desires to amend and restate the Original Agreement in connection with the admission of new Members." (2005 Agreement at 1, Def.'s Exs., Ex. 2, Dkt. No. 86-2.) The 2005 Agreement added Zakin and Cross as those members. (*Id.* ¶ 2.)

The 2005 Agreement specified the following regarding capital contributions:

(a)   The Members have committed to contribute to the capital of the Company the amounts set forth opposite such Member's name in the column entitled "Capital Contribution of Member" on **Exhibit A**, and shall be issued that number of Class A Units, Class B Units, Class C Units and Notes as set forth on **Exhibit A** hereto.

(b)   The Company shall issue Class A Units, Class B Units, and Class C Units with such rights, preferences and obligations as set forth in this Agreement. At any time that a Member contributes capital to the Company, the Company shall issue Units to such member in such amounts as may be determined in accordance with this **Article III**. The Company shall initially issue each Class A Unit for a total capital Contribution of $0.01 per Class A Unit.

(c)   The Company shall issue Notes in the form of **Exhibit B** hereto with such rights, preferences, and obligations as set forth in this Agreement. Notes shall be issued in the minimum principal amount of $50,000.

(d)   The Company is offering an aggregate of $500,000 of Notes and Class A Units (with a minimum Capital Contribution of $50,000, except as otherwise determined by the Board of Managers in its sole discretion). A Person who makes a minimum Capital Contribution of $50,000 will receive a Note in the principal amount of $50,000 and 50,000 Class A Units.

(e)   The Members hereby acknowledge and agree that for income tax purposes only (and not for any other purpose) the Notes shall be treated as equity investment in the Company by the Note Holders.

(2005 Agreement §§ 3.1 (a)-(e).) Although the 2005 Agreement was signed by all relevant parties, Exhibit A was left blank. (*Id.* at A-1.) Cross and Zakin did, however, make capital contributions towards the newly formed company. (DSOF ¶ 6.) Specifically, Zakin made a capital contribution of $135,000, and Cross made a capital contribution of $154,000 to BCZ. (*Id.*)

The 2005 Agreement stated that the Company would be managed by Batterson, Cross, and Zakin as "Managing Principals." (*Id.* § 6.1 (b).) The affirmative vote of at least two Managing Principals would be required to approve day-to-day company business. (*Id.*) The contract required all three parties, however, in order to effectuate "any amendment or modification of this Agreement as contemplated by Article 11." (*Id.* § 6.1 (b)(x).)

Distributions under the Agreement were to be made in the following manner:

**6.3   Priority Distribution: Other Payments.**

(a) For each fiscal year of the Company the Managing Principals shall be entitled to receive an amount (a **"Priority Distribution"**) determined in accordance with this Section 6.3(a). Until otherwise determined by the Board of Managers, for each fiscal year (i) Batterson shall receive a Priority Distribution of $500,000, (ii) Cross shall receive a Priority Distribution of $150,000, and (iii) Zakin shall receive a Priority Distribution of $300,000. The amount of the Priority Distribution of each Managing Principal may be adjusted from time to time upon the unanimous approval of the Board of Managers. To the extent that cash is available, the Priority Distribution shall be paid on a monthly basis. Notwithstanding the above, to the extent that the Board of Managers determines that cash is not available for the Priority Distribution for any month or fiscal year, the Board of Managers shall be authorized to defer the distribution of the Priority Distribution with respect to such month or fiscal year to subsequent months or fiscal years.

(b) Compensation otherwise payable to a Managing Principal for serving as an officer, director, or manager (or similar position) in any Investment entity shall be treated as follows:

(i) Any opinions to purchase equity (or similar equity incentive) of such Investment otherwise issuable to a Managing Principal, shall be distributed 50% to Unit Holders holding Class A Units and Class C Units, pro rata based on their ownership of Class A Units and Class C Units, and 50% to the Managing Principals pro rata based on their ownership of Class B Units; and

(ii) Any cash or other property otherwise payable to such Managing Principal shall be distributed 100% to the Managing Principals pro rata based on their ownership of Class B Units.

(*Id.* § 6.3.) These distributions were made from "Operating Cash Flow" and "Capital Proceeds" as defined within the Agreement. (*Id.* §§ 1, 5.3(a), 5.4(a).) It is undisputed that BCZ did not have Capital Proceeds in 2005 or any subsequent year until 2015. (PSOF ¶ 20.) In September and October 2005, the parties discussed whether or not to provide themselves with priority distributions or to accrue and defer the distributions for a later time. (PSOF ¶ 54.) This discussion includes an October 2005 email indicating that Cross and Zakin intended to accrue their priority distributions. (*Id.*) Nevertheless, BCZ did pay out the following amounts to each of the Managing Principals from 2006 to 2010:

|            | 2006      | 2007      | 2008      | 2009      | 2010      |
|------------|-----------|-----------|-----------|-----------|-----------|
| Batterson  | $269,090  | $198,878  | $320,503  | $265,170  | $269,325  |
| Cross      | $10,360   | $20,000   | $130,750  | $102,945  | $3,500    |
| Zakin      | $1,300    | $0        | $0        | $0        | $0        |

(PSOF ¶ 21.) There is a disagreement among the parties as to whether these payments were authorized and whether they

- 5 -

constituted priority distributions as set forth in the 2005 Agreement. (*See, e.g.*, PSOF ¶¶ 54–61.)

Beginning in 2006, the Company started investing in a technology company named Cleversafe, Inc. (PSOF ¶ 22.) The majority of BCZ's investment was funneled through the limited liability company BCZ-I Cleversafe, LLC, a company directly managed by BCZ. (*Id.* ¶ 23.) BCZ managed BCZ-I Cleversafe directly and thus received the carried interest for money made from BCZ-I Cleversafe's operations. (Batterson Dep. 86:9–24.) In the event that Cleversafe, Inc. was successful and BCZ-I Cleversafe became lucrative, BCZ would receive a carried interest fee of twenty percent from BCZ-I Cleversafe. (*Id.* 87:14–19.) In 2015, just such an event occurred. IBM acquired Cleversafe, Inc., and BCZ-I Cleversafe received $47.6 million in proceeds. (*Id.* 178:9–13; PSOF ¶ 47.) This lawsuit is the resulting dispute between Zakin, Cross, and Batterson as to how the proceeds, which eventually filtered up to BCZ, should be distributed.

The parties' testimony regarding the operations of the Company between 2007 and 2015 differs significantly between Plaintiffs and Defendant. The parties agree that, in 2007, there were discussions regarding a possible change in status for Zakin within BCZ after Zakin became the CEO of Cleversafe, Inc. (PSOF ¶ 24.) Similarly, in 2009, the parties discussed a possible change

in status for Cross when he became the CEO of NextGen Solar, another company in which BCZ had invested. (PSOF ¶ 33.) Beyond agreeing that discussions took place, however, the parties' narratives as to what happened after the negotiations divulge sharply.

Defendant Batterson testifies that Zakin and Cross, while never officially providing a written resignation, were "gone and we all knew it." (Batterson Dep. 121:10–19, Def.'s Redacted Resp. to Pl.'s Stmt. Add'l of Facts, Ex. 55, Dkt. No. 104-1.) Batterson stated that Zakin and Cross were running their respective startups full-time, which "is more than a full time job." (*Id.* 119:19–23.) Because they spent 100% of their time on their new roles as CEO they, "in effect ha[d] resigned." (*Id.* 120:24–121:3.)

In contrast, Plaintiff Zakin testified that BCZ was not like a typical venture capital firm, where the company "would raise 50 to a hundred million dollars and get 2 to 5 percent of that every year." (Zakin Dep. 29:15–17, Pl.'s Stmt. of Facts, Ex. 2, Dkt. No. 88-2.) Instead, it was a "special purpose vehicle designed to hold the entity until the exit," and the only substantive payments provided to investors was the distribution of profits from a sale. (*Id.* 29:17–25.) Since all of the parties agreed to invest indefinitely in all of BCZ's investments, including Cleversafe, Inc. and NextGen Solar, both Cross and Zakin feel entitled to some

of the funds as set forth under the 2005 Agreement in the event these investments became profitable.

The parties also dispute whether the fact that Cross and Zakin were listed as "affiliates" in various emails and press releases necessarily indicates that the two Plaintiffs had stepped down as Managing Principals. (PSOF ¶¶ 38–40.) At his deposition, Batterson admitted he had authored an email which stated:

> Jonathan [Zakin], as mentioned, is now the CEO of one of our portfolio companies, Cleversafe, so he would officially become an affiliate of the firm shortly, but his name will remain in LLC and he will continue to work with us on deals. We needed to move him to affiliate status for now since the investors in Cleversafe would be uncomfortable with him appearing as managing partner in BCZ as he takes on this new responsibility for Cleversafe. No real change here, just cosmetic.

(Batterson Dep. 171:16–172:24.) Batterson explained this email at his deposition by stating that the cosmetic-level change was only for "a couple of days," and then Zakin left permanently. Batterson points to this email, as well as other materials over the half-decade in dispute, as proof that Zakin and Cross had notice that they were no longer Managing Principals. (*See, e.g.,* PSOF ¶¶ 38–40; Batterson Dep. 173:3–4 ("No. He left as a managing principal, but now he's an affiliate and is still part of the deal.") Some of the disputed materials are detailed below.

On May 12, 2010, Batterson sent an email to Zakin and Cross informing them that "Jim Vaughan . . . has joined me in BCZ which

we are renaming Batterson Venture Capital with Bob [Cross] leaving." (PSOF ¶ 39.) Neither Cross nor Zakin responded to this email. (*Id.*) This same statement was circulated more widely in late 2011, when Batterson emailed a group of persons involved in BCZ, including Cross and Zakin, and stated that the Company was changing its name to Batterson Venture Capital, LLC and that a person named Jim Vaughn would be the only additional Managing Principal beyond himself. (PSOF ¶ 40.) The email also attached an amended operating agreement. (*Id.*) Zakin never signed his agreement to this amendment. (Def's Resp. to Pl.'s Stmt. of Add'l Facts "DSOAF" ¶ 34, Dkt. No. 107.) Cross did sign a document related to this amendment but testified in his deposition that it was not intended to be a consent to the new operating agreement, but instead an acknowledgement of the Company's 2011 promissory note. (*Id.* ¶ 35.) The 2010 Agreement made several changes, including a readjustment of distributions, based in part on each member's contributions to the Cleversafe, Inc. investment. (PSOF ¶ 41.) After the 2011 email, Batterson began operating BCZ under the new operating agreement, including using the name Batterson Venture Capital, LLC.

The different realities existing between the parties did not have consequences until late 2015, when the returns in the investment in Cleversafe, Inc. became more certain. (PSOF ¶ 46.)

On December 15, 2015, Batterson wrote the following email to the accountant for the Batterson Venture Capital/BCZ entity, Peter Cavallo:

> Peter,
> I am not sure how we booked the 15% accrual for Jon Zakin, Bob Cross, me, and Jim Vaughan but I think we should have a 15% accrual for the four of us on what we invested from the time of each investment as well as pay any capital back pro rata with other investors otherwise the guys that did some of the work not his will not be rewarded.
> Len

(12/2/2015 Email, Pl.'s Exs., Ex. 22, Dkt. No. 86-2.) On December 2, 2015, Batterson sent a second email to Peter Cavallo, stating,

> Peter,
> See section 3.2 page 12 of the attached operating agreement. Looks like we would need to hold notes for the capital contributed to pay interest and capital back to us. I don't believe that notes were ever issued although perhaps we could do so now?
> Len
> cc: Annie please check and see if noted were ever issued to Jon, Bob, me, or Jim.

(12/13/2015 Email, Pl.'s Exs., Ex. 23, Dkt. No. 86-2.) On December 13, 2015, Annie Piotrowski, the Batterson Venture Capital/BCZ entity's secretary, wrote back, "not sure what was determined here?" (*Id.*) In response, Peter Cavallo replied,

> Annie:
> There was an informal arrangement to not pay interest to the principals, LB, JZ, RC and maybe JV, and now that has gone by the wayside.
> So you need to check your files to see if there are notes for all of the above and if not issue them for each

- 10 -

> amount contributed and submit to the individuals for
> signing. At least that's my understanding of the matter.
> You may want to think about it and see what you recall
> and confirm my understanding with LB.
> Pete Cavallo

(*Id.*) Eventually, Batterson determined that, "[t]o the extent any amounts due to any of the managing principals were being deferred, they would have needed to be accounted for in the form of an accrual or some other entry in those financial statements." (PSOF ¶ 55.) As there was no accounting evidence of notes which would require disbursements, Batterson, acting on behalf of the Batterson Venture Capital/BCZ entity, made no distributions to Cross or Zakin. Plaintiffs dispute this determination, and claim they are still entitled to funds under the 2005 Agreement. (*Id.*)

On January 10, 2017, Cross and Zakin filed this suit in the U.S. District Court for the Northern District of Illinois. (Dkt. No. 1.) Batterson twice filed a Motion to Dismiss. (Dkt. Nos. 9, 72.) Both times, the Court dismissed the tort counts related to this action and allowed the breach of contract count to proceed. (Dkt. Nos. 19, 77.) All that is left at issue are Cross and Zakin's allegations that Batterson has breached the 2005 Operating Agreement by refusing to pay: (1) proceeds from the Cleversafe, Inc., transaction based on the Notes issued by BCZ, (2) proceeds from any direct investments that the BCZ made in Cleversafe, Inc., and (3) any accrued but unpaid Priority Distributions from BCZ.

(Am. Compl. ¶ 31, Dkt. No. 70.) The parties have filed cross-motions for summary judgment. (Dkt. Nos. 85, 87.) Because there are disputes as to the material facts, the Court denies both motions.

## II.  <u>STANDARD</u>

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica*, 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court uses substantive law to "identify which facts are material" and reviews whether there is "a genuine issue for trial." *Anderson*, 477 U.S. 248-49.

In a cross-motion for summary judgment, the Court reviews the burden of proof each party bears on an issue at trial, and that party must "go beyond the pleadings and affirmatively [] establish a genuine issue of material fact." *Santaella v. Metro. Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997). For each motion, the Court must construe the record "in the light most favorable to the nonmovant" and avoid "the temptation to decide which party's version of the facts is more likely to be true." *Payne v. Pauley*,

- 12 -

337 F.3d 767, 770 (7th Cir. 2003). The Court does not "resolve swearing contests between litigants." *Id.*

### III.  DISCUSSION

In diversity cases, a federal court applies the substantive law of the state in which it sits. *Kalmich v. Bruno*, 553 F.2d 549, 552 (7th Cir. 1977). Specifically, a federal court employs that state's choice of law doctrine. *ABF Cap. Corp. v. McLauchlan*, 167 F.Supp.2d 1011, 1014 (N.D. Ill. 2001). As established in the Court's prior opinion, *Cross v. Batterson*, No. 17 C 198, 2017 WL 2798398, at *3 (N.D. Ill. June 28, 2017), the Court applies Delaware substantive law per the parties' agreement. Under Illinois law, however, the Court still applies Illinois procedural rules, including Illinois' statute of limitations. *McLauchlan*, 167 F.Supp.2d at 1014.

Under Delaware law, a breach of contract claim consists of "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs." *Greenstar, LLC v. Heller*, 814 F.Supp.2d 444, 450 (D. Del. 2011). Batterson moves for summary judgment on the theory that there is no contractual obligation, either because Cross and Zakin were no longer Managing Principals in 2010 or because they acquiesced, through silence, to the new 2010 Agreement. Batterson also moves for summary judgment on Plaintiff's specific claim to priority

distributions, arguing that their demand for priority distributions beyond the 10-year mark is barred by Illinois' statute of limitations. Plaintiffs filed a cross-motion for partial summary judgment on the breach of contract claim as to the payment of notes or the equivalent amount of the notes in capital contributions.

### A. The Contractual Obligation

The first dispute between the parties is which operating agreement governs the lawsuit. This, in turn, affects whether or not there is a contractual obligation. Zakin and Cross argue that the 2005 Agreement, signed by all parties, is the current operating agreement. Batterson points to a 2010 Agreement, which he circulated and attempted to have all parties sign sometime in 2011, as the operating agreement.

Under the terms of the 2005 Agreement, Batterson, Cross, and Zakin are the "Managing Principals." (2005 Agreement § 6.1 (b).) All three parties must sign in order to enact "any amendment or modification of this Agreement as contemplated by Article 11." (Id. § 6.1 (b)(x).) It is undisputed that Zakin did not sign the modifications that were presented as the 2010 Agreement. Cross testified that he did sign the 2010 Agreement, but that he believed he was signing a document to secure his interest in a note that was circulated in the same email. As a result, Zakin and Cross

- 14 -

claim that the 2005 Operating Agreement continues to set forth the actual contractual obligation of BCZ generally, and Batterson particularly as the person with *de facto* access to the funds.

In response, Batterson first argues that the 2010 Agreement is operative because both Zakin and Cross left their positions as Managing Principals prior to 2010, making their signatures unnecessary. The Court finds a contradictory record as to this argument. Batterson argues that Zakin and Cross left the Company, and that they left with the intent of forgoing any benefits to the contract as Managing Principals.

There is no clause in the 2005 Agreement that allows parties to rewrite the agreement when parties leave as Managing Partners. Additionally, Batterson himself stated in his deposition that Cross and Zakin's change from "Managing Partner" to "affiliate" was initially cosmetic in nature and the related communications were made to soothe investors, not formalize the change in position. Considering the evidence in the light most favorable to the plaintiffs, a jury could find that Zakin and Cross reasonably did not object to emails which characterized them as affiliates. Second, Batterson attempted to get both Cross and Zakin's signature for the 2010 Agreement, belying his argument that their signatures were unnecessary in 2010. As there are an abundance of contradictory facts as to the status of Cross and Zakin's status

from 2007 to 2015, the Court cannot resolve which agreement is currently operative at summary judgment.

Batterson additionally argues that he is entitled to summary judgment because Zakin and Cross received Batterson's email regarding the 2010 Agreement and did not object to their removal as Managing Principals, nor to Jim Vaughan's addition to the Company. Batterson cites to *Lehman Brothers Holdings Inc. v. Spanish Broadcasting System, Inc.*, No. CIV.A. 8321-VCG, 2014 WL 718430 (Del. Ch. Feb. 25, 2014), *aff'd*, 105 A.3d 989 (Del. 2014), for the proposition that silence can be acquiescence that trumps contract terms under Delaware law.

In *Lehman Brothers*, the plaintiffs were investors in the defendant company and received dividends from the defendant on a quarterly basis. *Id.* at *1. According to the investment contract, if the company failed to provide dividends for four consecutive quarters, the plaintiff investors could submit a written request to call a stockholder meeting, called a "voting rights triggering event." *Id.* at *2. Once this event occurred, the defendant was prohibited from incurring additional debt. *Id.* at *3. When the defendant company stopped paying dividends in 2009, the opportunity for a "voting rights triggering event" occurred in July 2010, but the plaintiff investors did not intervene. *Id.* at *4. The company then acquired debt in publicly announced

transactions in 2011 and 2012. *Id.* at *5. It was not until February 14, 2013, that plaintiffs filed suit, alleging a 2010 breach of contract. *Id.* The Delaware Chancery Court first noted that plaintiffs had, in 2010, initiated a voting rights triggering event. *Id.* at *6. As a result, the court did not determine plaintiff investors' current rights under the contract, only whether or not plaintiffs were entitled to damages in connection with the 2011 and 2012 debt offerings. *Id.* The court found the substantive portions of the contract ambiguous but held that the "crucial fact in relation to the [voting rights triggering event] — the payment (or nonpayment) of dividends — is uniquely within the interests of the Plaintiffs as preferred stockholders with large ownership interests in the instruments, the Plaintiffs' knowledge of the circumstances affecting their rights as preferred stockholders must be imputed to them." *Id.* at *10.

As a result, the Court held that the five components of acquiescence under Delaware law, "(1) the plaintiff remained silent (2) with knowledge of her rights (3) and with the knowledge or expectation that the defendant would likely rely on her silence, (4) the defendant knew of the plaintiff's silence, and (5) the defendant in fact relied to her detriment on the plaintiff's silence," were met. *Id.*

The Court finds salient differences that frustrate a blind application of *Lehman Brothers*. Plaintiffs in this case, Cross and Zakin, testified that the Company was a holding entity for investments, where the operable time period was not quarterly, as in *Lehman Brothers*, but an indefinite time, if ever, until one of the many investments made by BCZ was successful. Plaintiffs also testified that Batterson was a trusted friend whom they had a long working relationship with on many investments. As a result, there is muddled evidence that Cross and Zakin had "the knowledge or expectation that [Batterson] would rely on [their] silence" to prevent them from benefiting under the 2005 Agreement. *Id.*

There is an additional question of fact as to whether Defendant did, in fact rely on Plaintiffs' silence as required under the fifth prong of acquiescence test under Delaware law. Unlike the defendant company in *Lehman Brothers*, who actively raised money without plaintiff's interference, the evidence presented to this Court finds that Batterson did not rely on Plaintiffs' silence in 2010, but rather his poor record-keeping in 2015, to justify the decision to deny Zakin and Cross distributions. According to the emails exchanged in 2015, Batterson seemed to initially believe that Cross and Zakin were entitled to notes, or the equivalent of notes, from the Cleversafe, Inc. sale as set forth in the 2005 Agreement. It was only after

Batterson realized that the accounting for the Company had not properly reflected all of the Managing Principals' contributions that Batterson determined that he had no obligations.

Because there are "two competing views to explain the motivations behind [the plaintiffs'] action or inaction," the Court declines to grant summary judgment on the basis of acquiescence and reserves the question for the jury. *Mizel v. Xenonics, Inc.*, No. CIV.A.06C-02-145-JOH, 2007 WL 4662113, at *7 (Del. Super. Ct. Oct. 25, 2007)

### B. Breach of Obligation

In the Amended Complaint, Zakin and Cross allege three different breaches of the contract: failure to pay out on the initial notes, failure to pay out on the direct investments, and failure to pay on the priority distributions. Cross and Zakin move for partial summary judgment relating to the initial notes and the direct investments. Batterson moves for summary judgment regarding the breach of contract relating to priority distributions of 2005 and 2006.

### 1. Breach of Contract on the Notes and/or Capital Contributions

Under the plain reading of the 2005 Operating Agreement, the Company promised that a person who made "a minimum Capital Contribution of $50,000 will receive a Note in the principal amount of $50,000 and 50,000 Class A Units." (2005 Agreement §3.1(d).)

Zakin and Cross each contributed over $50,000 as specified in the agreement, but never received promised notes.

Zakin and Cross then borrow language from the 2010 Agreement to argue that, even if not provided with notes, they should be reimbursed for their capital contributions as if notes had been issued. The 2010 Agreement provides that, "[i]n lieu of the issuance of Notes . . . the Company may issue other evidence of indebtedness for the purchase of Notes such as a term sheet for the Purchase of Notes." (2010 Agreement § 3.1(b)–(c), Def.'s Smt. Of Facts, Ex. 30, Dkt. No. 91-5.) Although underdeveloped, the Court understands Zakin and Cross to argue that the 2010 Agreement language bolsters the claim that Batterson was aware the Company had not issued any notes when he revised the contract in 2010, and thus included the actual method BCZ employed to keep track of the capital contributions. In summary, Zakin and Cross argue that BCZ should have issued the notes, but, because the Company instead kept the capital contributions on an internal excel spreadsheet, the two are entitled at summary judgment as to either the notes or the corresponding capital contribution payment, plus interest, as set forth on the spreadsheet.

Batterson argues that Cross and Zakin's claim for notes is barred by Illinois' statute of limitations, either under 735 ILCS § 5/13-206's ten-year limitation or 735 ILCS § 5/13-205's five-

year limitation. Section 5/13-206 holds that "actions on . . . promissory notes . . . shall be commenced within 10 years next after the cause of action is accrued." Section 5/13-205 covers unwritten contracts, express or implied, which "shall be commenced within 5 years next after the cause of action accrued."

Batterson assumes, without pointing to evidence in the record, that Cross and Zakin's claim on the notes would accrue in 2005. However, the 2005 Agreement promises only that person who makes a certain capital contribution "will receive a Note" and does not appear to provide a promise about when the note will be issued. (2005 Agreement § 3.1(d).) As a result, the contract appears ambiguous as to whether the breach occurred directly after the contribution or when Batterson refused to issue the note upon request. Nevertheless, the Court assumes a breach of contract and then reviews whether Plaintiffs' claims are barred under either of Illinois' statute of limitations.

In Illinois, a written contract is strictly interpreted. *Toth v. Mansell*, 566 N.E.2d 730, 733 (Ill. App. Ct. 1990). If any parol evidence is needed for the essential terms of the contract, then the contract must be treated as oral for the purposes of the statute of limitations. *Id.* When parol evidence is required "to determine whether that contract was enforceable . . . and whether the terms of the original agreement were altered," the 5-year

statute of limitations applies. *Ramirez v. Palisades Collection LLC*, No. CIV.A.07-C-3840, 2008 WL 2512679, at *3 (N.D. Ill. June 23, 2008).

Here, there is testimony that the 2005 Agreement was good "for about a week" before the parties began making oral modifications to its contents, albeit with different memories as to the details of the modifications. (*See* DSOAF ¶ 14.) For example, there is evidence that the parties may have made an informal agreement to hold off on providing interest as set forth in the written instrument until any actual profit resulted from the Company. (*See, e.g.*, 12/13/2015 Email ("There was an informal arrangement to not pay interest to the principals, LB, JZ, RC and maybe JV, and now that has gone by the wayside.").) There is also evidence that the parties agreed to keep the Notes solely through calculations on an internal spreadsheet instead of through the established instrument written in the 2005 Agreement.

Because parol evidence is required to clarify whether a contractual obligation remained between the parties, it is possible that the contract was breached in 2015 when Batterson refused to issue the notes and priority distributions, at which point the 5-year statute of limitations began to accrue. It was also possible that the contract was breached in 2010 or 2011 with the removal of the Plaintiffs from the 2005 Agreement. In either

case, it is impossible for the Court to find that there is no genuine issue of material fact on this issue. Cross and Zakin's allegations regarding the breach of contract as to the Notes or other equivalent capital contributions are beyond the purview of summary judgment.

### 2. *Breach of Contract on Priority Distributions*

Finally, Batterson moves for summary judgment on Cross and Zakin's claim to 2005 and 2006 priority distributions as they are beyond Illinois' 10-year statute of limitations. 735 ILCS § 5/13-206. For the same reasons set forth above, the Court denies summary judgment on this ground. The record is replete with evidence that oral modifications were made to the agreement, including some evidence that the parties agreed to defer and accrue interest on the priority distributions. If Zakin and Cross agreed to have their distributions deferred until one of the investments succeeded, the Court cannot find that the 2005 Agreement was breached, and thus the claim began to accrue, prior to the 2015 Cleversafe, Inc. transaction. The Court therefore denies Cross' Motion for Summary Judgment on this issue.

### IV.  <u>CONCLUSION</u>

For the reasons stated herein, Plaintiffs Cross and Zakin's Motion for Partial Summary Judgment (Dkt. No. 85), and Defendant

Batterson's Motion for Complete Summary Judgment (Dkt. No. 87) are denied.

**IT IS SO ORDERED.**

_____

Harry D. Leinenweber, Judge
United States District Court

Dated: 12/10/2021